IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>v.<br><br>OLUWATOBI ALABI YEROKUN,<br>[DOB 8/05/1985]<br><br>                      Defendant. | Case No. 22-CR-00221-HFS<br><br>**COUNT ONE**<br>18 U.S.C § 371<br>NMT Five Years Imprisonment<br>NMT $250,000 Fine<br>NMT Three Years Supervised Release<br>Restitution may be ordered<br>Class D Felony<br><br>$100 Mandatory Special Assessment |

# I N F O R M A T I O N

### Introduction and Background

*Defendant Oluwatobi Alabi Yerokun*

1. From on or about February 2019 through April 2021, defendant Oluwatobi Alabi Yerokun was a physician who practiced medicine, among other places, in the State of Missouri.

*The Medicare Program*

2. The Medicare Program (Medicare) was a federally-funded program that provided free or below-cost health care benefits to certain people, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services (HHS), through its agency, the Centers for Medicare and Medicaid Services (CMS), oversaw and administered Medicare. Individuals who received Medicare benefits were commonly referred to as Medicare "beneficiaries."

3. Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b) and a "Federal health care program" as set forth in 42 U.S.C. § 1320a-7b(b).

4. Various Medicare program parts covered different types of benefits. Medicare

Part B was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers. These services included office visits, minor surgical procedures, and laboratory testing that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

5. A Medicare claim was required to include certain important information such as: (a) the Medicare beneficiary's name and Health Insurance Claim Number (HICN) or Medicare Beneficiary ID (MBI); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or services; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as the unique identifying number, known as either the Unique Physician Identification Number (UPIN) or National Provider Identifier (NPI). The claim form could be submitted in hard copy or electronically.

6. CMS acted through fiscal agents called Medicare administrative contractors (MACs) that were statutory agents for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7. Medicare regulations governing Part B (such as physician services) exclude from coverage "any services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1).

8. Medicare regulations require that all diagnostic laboratory tests, which include genetic tests, "must be ordered by the physician who is treating the beneficiary, that is, the physician provides a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). They further provide that "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

9. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the function of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis or a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). The statutory exceptions that Medicare covered included cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

*The Missouri Medicaid Program*

10. MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to eligible Medicaid recipients. Individuals who received Medicaid benefits were commonly referred to as Medicaid "beneficiaries."

11. Medicaid was a "health care benefit program" as defined by 18 U.S.C. § 24(b) and a "Federal health care program" as set forth in 42 U.S.C. § 1320a-7b(b).

12. A Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by

Mo HealthNet rules and regulations in rendering and billing for services.

13. Medicaid providers are required to submit claims electronically. Per Medicaid regulations, the Medicaid provider agrees that services described on the electronic claim are true, accurate, and complete, and the provider certifies that the services described on the claim were personally rendered by the provider. The provider's medical record documentation must support the medical necessity of the service being provided. 13 Mo. C.S.R. 70-3.160. Medicaid regulations also state that:

> Any person, with intent to defraud or deceive, makes, causes to be made, or assists in the preparation of any false statement, misrepresentation, or omission of material fact in any claim or application for any claim, regardless of amount, knowing the same to be false, is subject to civil or criminal sanctions, or both, under all applicable state and federal statutes."

*Id*.

### *Defendant Yerokun's Obligations as a Medicare and Medicaid Provider*

14. On multiple occasions between 2015 and 2018, defendant Yerokun signed an enrollment application with Medicare which stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute . . .).

15. In that application, defendant Yerokun also signed and agreed that he "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate indifference or reckless disregard of their truth or falsity."

16. On or about July 18, 2018, defendant Yerokun electronically signed the certification statement on his Medicare application to provide medical services and bill Medicare in the State of Missouri.

17. On or about June 1, 2018, defendant Yerokun enrolled in the Missouri Medicaid program (known as Mo HealthNet). He signed a Missouri Medicaid provider agreement stating that he was "responsible for all services provided and all billing done under my provider number regardless to whom reimbursement is paid." He agreed to comply with "the Medicaid manual, bulletins, rules, and regulations as required by the [Division of Social Services/Medicaid Audit and Compliance] and the United States Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment."

18. Defendant Yerokun, in his Medicaid application, stated that he understood that he was required to make and maintain records "which fully demonstrate the extent, nature and medical necessity of services and items provided to recipients, which support the fee charged or payment sought for the services and items."

19. Defendant Yerokun, in his Medicaid application, also stated: "I understand that even though I do not bill Medicaid, if I order, prescribe, or refer for Medicaid services this agreement pertains to me as a provider."

*The Requirements to Establish a Physician-Patient Relationship under Missouri Law*

20. Defendant Yerokun practiced medicine in multiple jurisdictions, including, but not limited to, the State of Missouri.

21. Under the laws of the State of Missouri, a physician who uses telemedicine must ensure that "a properly established physician-patient relationship

5

exists with the person who received the telemedicine services." Mo. Rev. Stat. § 191.1146(1). This relationship may be established by: (a) "an in-person encounter through a medical interview and physical examination;" (b) consultation with another physician or their delegate "who has an established relationship with the patient and an agreement with the physician to participate in the patient's care;" or (c) a "telemedicine encounter, if the standard of care does not require an in-person encounter, and in accordance with evidence-based standards of practice and telemedicine practice guidelines that address the clinical and technological aspects of telemedicine." *Id.*

22. Under the laws of the State of Missouri, a physician-patient relationship may be established through telemedicine but prior to providing treatment, the physician must interview the patient, collect or review relevant medical history, and perform an examination sufficient for the diagnosis and treatment of the patient. Furthermore, under the laws of the State of Missouri, a questionnaire completed by the patient does not constitute an acceptable medical interview and examination for the provision of treatment by telemedicine. Mo. Rev. Stat. § 191.1146(2)(2).

*Durable Medical Equipment*

23. Durable medical equipment (DME) includes equipment and supplies such as off-the-shelf orthotics; and ankle, knee, back, elbow, wrist, and hand braces.

24. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury prescribed by a licensed physician.

*Genetic Testing*

25. Cancer genomic (CGx) testing used DNA sequencing to detect mutations in genes

6

that could indicate a higher risk of developing certain types of cancer in the future. Pharmacogenetic (PGx) testing used DNA sequencing to assess how the body's genetic makeup would affect its response to certain medications. Both of these tests were generally referred to as "genetic testing." Genetic testing was not a method to diagnose whether an individual had a disease, such as cancer, at the time of the test.

26. To conduct genetic testing, a laboratory needed to obtain a DNA sample (specimen) from the patient. Specimens were typically obtained from the patient's saliva by using a cheek swab to collect sufficient cells to provide a genetic profile. The specimen was then submitted to the laboratory to conduct the genetic tests.

27. With respect to genetic testing for Medicare beneficiaries, their DNA specimens were submitted along with laboratory requisition forms that identified the beneficiary, the beneficiary's insurance information, and the specific tests to be performed. In order for the laboratories to submit claims to Medicare for genetic testing, the tests had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test.

28. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## COUNT ONE
### Conspiracy to Make False Statements Regarding Health Care Matters
### 18 U.S.C. § 371

29. All previous paragraphs of this information are realleged and incorporated by

reference as though fully set forth herein.

30. From on or about February 2019 through on or about April 2021, the exact dates being unknown, in the Western Division of the Western District of Missouri and elsewhere, defendant Oluwatobi Yerokun did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown, to commit certain offenses against the United States, that is: To violate 18 U.S.C. § 1035 by, in a matter involving a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, knowingly and willfully: (a) falsifying, concealing, and covering up by trick, scheme, or device a material fact; and (b) making a materially false, fictitious, or fraudulent statement and representation, and making and using any materially false writing or document knowing the same to contain a materially false, fictitious statement or entry.

*Object/Purpose of the Conspiracy*

31. It was an object and purpose of the conspiracy for defendant Yerokun to unlawfully enrich himself and others known and unknown by making false and fraudulent statements and representations, and by signing and certifying false and fraudulent documents such as patient forms and physician orders.

*Manner and Means of the Conspiracy*

32. The manner and means by which defendant Oluwatobi Yerokun and his co-conspirators sought to accomplish the purpose and objects of the conspiracy included, among other things:

33. From on or about February 2019 to April 2021, defendant Yerokun contracted with and worked as a telemedicine provider for marketing, physician recruiting, and telemedicine companies including, but not limited to, Company A. These companies obtained information

about purported "patients," such as their insurance information. These companies provided this information to telemedicine providers such as Yerokun.

34. These marketing, physician recruitment, and telemedicine companies gave defendant Yerokun access to electronic portals so that he could receive information about the patients assigned to him. The information included, among other things, the patient's demographic information, the identity of the insurance provider such as Medicare or Medicaid, and the type of DME or genetic testing that Yerokun was to order for them.

35. Much of the patient information that defendant Yerokun received from Company A was pre-populated, that is, it had been filled in before Yerokun received it. For example, with respect to genetic testing, the subjective notes, objective notes, and plan and treatment goals were nearly always identical on the forms he received. For the majority of beneficiaries who were referred to him for genetic testing, he ordered the comprehensive inherited cancer panel.

36. Through the electronic portal that Company A made available to defendant Yerokun, he electronically signed the patient forms and orders he received from Company A. Yerokun signed the patient forms and certified that the DME and genetic tests were medically necessary. For the genetic tests, he also signed a separate letter of medical necessity.

37. Defendant Yerokun had no prior doctor-patient relationship with any of the Medicare or Medicaid beneficiaries, did not see or communicate with them, and did not attempt in any way to evaluate and determine their medical condition or needs. Before Yerokun signed the orders, he made no effort to find out how or from whom the patient information was obtained, who collected the information, the qualifications of any person gathering or providing the information, or whether the information was accurate and complete. Defendant Yerokun provided no follow-up care for these patients after he signed the orders for them to receive DME

9
Case 4:22-cr-00221-HFS   Document 5   Filed 09/21/22   Page 9 of 14

or genetic testing.

38. Yerokun knowingly and willfully made false and fraudulent statements and documents by certifying medical necessity. The statements and documents were false because, among other things, Yerokun did not have adequate information to assess medical necessity for the beneficiaries and to the extent that he had some patient information, he did not review and consider it in a manner sufficient to assess medical necessity. In addition, he rarely, if ever, declined to sign any orders. Moreover, for many or most of the patients, less than a minute elapsed between when he accessed the patient's information through the electronic portal and when he signed the order for DME or genetic testing. He knew his false and fraudulent statements and documents were untrue when he made them.

39. Defendant Yerokun's false statements and representations concerned material facts because Medicare and Medicaid would not have paid the claims submitted by the DME companies and testing laboratories if they had known that Yerokun had no physician-patient relationship with the beneficiaries, did not see or evaluate them, did not exercise independent medical judgment in signing orders, and spent only seconds to minutes reviewing the patient information.

40. Defendant Yerokun's contract with Company A provided that he was solely responsible for complying with all telemedicine laws.

41. The orders that defendant Yerokun signed were submitted to DME companies and clinical testing laboratories, many of whom paid illegal kickbacks to the individuals and entities who conspired to submit these false claims to Medicare and Medicaid.

42. When defendant Yerokun signed DME and genetic testing orders for Medicare and Medicaid beneficiaries, he knew that that they were covered by Medicare or Medicaid, and

he knew that his orders would be used to submit claims for payments to Medicare and Medicaid.

43. As further explained below in paragraphs 49-51, Medicare and Medicaid paid claims submitted by these DME companies and laboratories for DME and genetic testing that defendant Yerokun ordered.

44. Defendant Yerokun's orders for DME and genetic testing were not properly payable and reimbursable by Medicare and Medicaid because they contained false and fraudulent statements made by Yerokun.

45. Defendant Yerokun's false and fraudulent statements and documents contained in the orders and certifications that he submitted to Company A were in connection with the delivery of or payment for healthcare benefits, items, or services.

46. Defendant Yerokun signed orders for DME and genetic tests for Medicare and Medicaid beneficiaries who resided in the Western Division of the Western District of Missouri, among other places.

47. During the time period of the conspiracy, defendant Yerokun signed orders for DME and genetic testing for Medicare beneficiaries in 30 different states with the highest concentration of beneficiaries residing in the State of Missouri.

48. Company A paid defendant Yerokun approximately $20 for each order for DME or genetic testing that he signed. Between March 2019 and April 2021, Company A paid Yerokun $44,860 by electronically depositing funds into a bank account ending in 9742 that he maintained at Bank of America. During this time period, Yerokun ordered DME and genetic tests for 2,184 Medicare beneficiaries.

49. Between on or around May 2019 to April 2021, the orders for DME that defendant Yerokun signed for Medicare beneficiaries caused Medicare to be billed $6,211,207

by the DME companies and Medicare to pay those companies $3,094,181.

50. Between on around February 2019 to July 2019, the orders for genetic testing that defendant Yerokun signed for Medicare beneficiaries caused Medicare to be billed $1,248,344 by the laboratories and Medicare to pay the laboratories $371,302.

51. Between or around April 2019 to June 2019, the orders for genetic testing that defendant Yerokun signed for Medicaid beneficiaries caused Medicaid to be billed $2,525,926 by the laboratories and Medicaid to pay the laboratories $524,734.

*Overt Acts*

52. In furtherance of the conspiracy, and to accomplish its object and purpose, defendant Yerokun and other conspirators, both known and unknown, committed and caused to be committed, in the Kansas City Division of the Western District of Missouri and elsewhere, the following overt acts:

53. Between on or about May 28, 2019 and June 21, 2019, defendant Yerokun signed orders for Medicare beneficiary B.C. to receive eleven braces, a type of DME. At the time, B.C. was 86 years old. Yerokun did not have a physician-patient relationship with B.C., and he never saw, communicated with, or evaluated her. Yerokun ordered the same two knee orthoses for each knee within three weeks. B.C. did not use any of the braces and returned six or seven boxes of them. On June 21, 2019, Yerokun signed orders for braces for both of B.C.'s ankles and both of her knees. The time that elapsed between when he accessed B.C.'s patient information and signed the orders for those braces was 18 seconds. DME companies billed Medicare $4,994 for those braces, and Medicare paid $2,901 for those braces.

54. Genetic testing marketers approached Medicare beneficiary A.K. about genetic testing at a food pantry and offered her free hot dogs. A.K. provided a cheek swab and her

Medicare information but never received any test results. She never saw nor communicated with defendant Yerokun. On June 1, 2019, after Yerokun reviewed A.K.'s patient information for 38 seconds, he ordered 19 genetic tests for her. Based on the tests that he ordered, the laboratory billed Medicare $16,350 and Medicare paid $5,818 for those tests.

55. On June 1, 2019, defendant Yerokun spent 34 seconds reviewing Medicare beneficiary E.M.'s patient information and then ordered 15 genetic tests for her. Based on the tests that he ordered, the laboratory billed Medicare $14,360 and Medicare paid $2,963 for those tests. Yerokun never saw or communicated with E.M.

56. On that same day, June 1, 2019, defendant Yerokun spent 27 seconds reviewing Medicare beneficiary B.B.'s patient information and ordered 15 genetic tests for her. Based on the tests that he ordered, the laboratory billed Medicare $14,360 and Medicare paid $3,763 for those tests. Yerokun never saw or communicated with B.B.

57. In approximately October 2019, genetic testing marketers visited Medicaid beneficiary C.B. at her senior apartment complex. They told her that the tests would be free because she was covered by Medicaid. She provided the marketers with her Medicaid information, and they swabbed her cheek and gave her a free back scratcher for participating. On May 18, 2019, Yerokun spent 51 seconds reviewing her patient information and then ordered 25 genetic tests for her. Based on the tests that he ordered, the laboratory billed Medicaid $30,533 and Medicaid paid $6,560. Yerokun never saw or communicated with B.B.

58. As set forth in the table below, between on or about March 2019 and April 2021, defendant Yerokun received $44,860.00 from Company A as payment for signing orders for DME and genetic testing for Medicare beneficiaries.

| Date of Deposit from Barton to Yerokun | Amount of Deposit from Barton to Yerokun |
|---|---|
| March 2019 | $480.00 |
| April 2019 | $100.00 |
| May 2019 | $160.00 |
| June 2019 | $3,920.00 |
| July 2019 | $700.00 |
| August 2019 | $1,820.00 |
| September 2019 | $1,380.00 |
| October 2019 | $3,840.00 |
| November 2019 | $3,360.00 |
| December 2019 | $2,840.00 |
| January 2020 | $1,820.00 |
| February 2020 | $1,440.00 |
| March 2020 | $1,360.00 |
| April 2020 | $1,260.00 |
| May 2020 | $2,880.00 |
| June 2020 | $1,280.00 |
| July 2020 | $2,020.00 |
| August 2020 | $3,160.00 |
| September 2020 | $1,580.00 |
| October 2020 | $5,420.00 |
| November 2020 | $1,380.00 |
| December 2020 | $880.00 |
| January 2021 | $1,060.00 |
| February 2021 | $220.00 |
| March 2021 | $180.00 |
| April 2021 | $320.00 |
| TOTAL | $44,860.00 |

All in violation of 18 U.S.C. § 371.

Respectfully submitted,

Teresa A. Moore
United States Attorney

By    */s/ Lucinda S. Woolery*
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122