IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 22-cr-221-HFS |
| OLUWATOBI ALABI YEROKUN, | |
| Defendant. | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

**1. The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Teresa A. Moore, United States Attorney, and Lucinda S. Woolery, Assistant United States Attorney, and the defendant, Oluwatobi Alabi Yerokun ("the defendant"), represented by Ashlee Martin and Poorav Rohatgi.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

**2. Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count One of the information charging him with a violation of 18 U.S.C. § 371, that is, conspiracy to make false statements related to health care matters. By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is in fact guilty of this offense.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which he is pleading guilty are as follows:

From on or about February 2019 through April 2021, Oluwatobi Alabi Yerokun was a physician who practiced medicine, among other places, in the State of Missouri.

Medicare and Medicaid were "health care benefit programs" as defined by 18 U.S.C. § 24(b) and "Federal health care programs" as set forth in 42 U.S.C. § 1320a-7b(b).

On multiple occasions between 2015 and 2018, Yerokun signed an enrollment application with Medicare which stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute . . .).

In that application, Yerokun also signed and agreed that he "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate indifference or reckless disregard of their truth or falsity." On or about July 18, 2018, Yerokun electronically signed the certification statement on his Medicare application to provide medical services and bill Medicare in the State of Missouri.

On or about June 1, 2018, Yerokun enrolled in the Missouri Medicaid program (known as Mo HealthNet). He signed a Missouri Medicaid provider agreement stating that he was "responsible for all services provided and all billing done under my provider number regardless to whom reimbursement is paid." He agreed to comply with "the Medicaid manual, bulletins, rules, and regulations as required by the [Division of Social Services/Medicaid Audit and Compliance] and the United States Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment." Yerokun, in his Medicaid application, stated that he understood that he was required to make and maintain records "which fully demonstrate the extent, nature and medical necessity of services and items provided to recipients, which support the fee charged or payment sought for the services and items." Yerokun, in his Medicaid application, also stated: "I understand that even though I do not bill Medicaid, if I order, prescribe, or refer for Medicaid services this agreement pertains to me as a provider."

Cancer genomic (CGx) testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancer in the future. CGx tests were generally referred to as "genetic testing."

Genetic testing was not a method to diagnose whether an individual had a disease, such as

2

cancer, at the time of the test.

To conduct genetic testing, a laboratory needed to obtain a DNA sample (specimen) from the patient. Specimens were typically obtained from the patient's saliva by using a cheek swab to collect sufficient cells to provide a genetic profile. The specimen was then submitted to the laboratory to conduct the genetic tests. With respect to genetic testing for Medicare beneficiaries, their DNA specimens were submitted along with laboratory requisition forms that identified the beneficiary, the beneficiary's insurance information, and the specific tests to be performed. In order for the laboratories to submit claims to Medicare for genetic testing, the tests had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

From on or about February 2019 through on or about April 2021, the exact dates being unknown, in the Western Division of the Western District of Missouri and elsewhere, defendant Oluwatobi Yerokun did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown, to commit certain offenses against the United States, that is: To violate 18 U.S.C. § 1035 by, in a matter involving a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, knowingly and willfully: (a) falsifying, concealing, and covering up by trick, scheme, or device a material fact; and (b) making a materially false, fictitious, or fraudulent statement and representation, and making and using any materially false writing or document knowing the same to contain a materially false, fictitious statement or entry.

From on or about February 2019 to April 2021, certain individuals and entities, such as marketing, physician recruiting, and telemedicine companies, some of whom were unknown to Yerokun, developed a scheme that targeted the Medicare and Medicaid programs to obtain reimbursement from those programs and information about purported "patients," such as their insurance information. Company A, a locum tenens physician staffing company, solicited Yerokun and contracted with him to work as a telemedicine provider. Company A's clients included various medical clinics and medical service and device companies. Company A gave Yerokun access to electronic portals so that he could receive information about the patients assigned to him. The information included, among other things, the patient's demographic information, the identity of the insurance provider such as Medicare or Medicaid, and the type of durable medical equipment (DME) or genetic testing that Yerokun was supposed to order for them.

Much of the patient information that Yerokun received from Company A was pre-populated, that is, it had been filled in before Yerokun received it. For example, with respect to genetic testing, the subjective notes, objective notes, and plan and treatment goals were nearly always identical on the forms he received. According to Yerokun, he understood his assignment to be to only review the charts. Through the electronic portal that Company A made available to defendant Yerokun, he electronically signed the patient forms and orders he received from Company A. Yerokun signed the patient forms and certified that the DME and genetic tests were

3

medically necessary. For the genetic tests, he also signed a separate letter of medical necessity.

Yerokun had no prior doctor-patient relationship with the Medicare or Medicaid beneficiaries and did not see or communicate with them. Before Yerokun signed the orders, he made little effort to find out how or from whom the patient information was obtained, who collected the information, the qualifications of any person gathering or providing the information, or whether the information was accurate and complete. Yerokun provided no follow-up care for these patients after he signed the orders for them to receive DME or genetic testing.

By knowingly and willfully electronically signing the orders, Yerokun made false and fraudulent statements and documents by certifying medical necessity. The statements and documents were false because, among other things, Yerokun did not have adequate information to assess medical necessity for the beneficiaries. In addition, he rarely, if ever, declined to sign any orders. Moreover, for many or most of the patients, less than a minute elapsed between when he accessed the patient's information through the electronic portal and when he signed the order for DME or genetic testing. Accordingly, he knew his false and fraudulent statements and documents were untrue when he made them.

Yerokun's false statements and representations concerned material facts because Medicare and Medicaid would not have paid the claims submitted by the DME companies and testing laboratories if they had known that Yerokun had no physician-patient relationship with the beneficiaries, did not see or evaluate them, and spent only seconds to minutes reviewing the patient information.

The orders that Yerokun signed were submitted to DME companies and clinical testing laboratories, many of whom paid illegal kickbacks to individuals and entities unknown to Yerokun, who conspired to submit these false claims to Medicare and Medicaid. When Yerokun signed DME and genetic testing orders for Medicare and Medicaid beneficiaries, he knew that that some were covered by Medicare or Medicaid, and he knew that his orders would be used to submit claims for payments to Medicare and Medicaid. Medicare and Medicaid paid claims submitted by these DME companies and laboratories for DME and genetic testing that Yerokun ordered. Yerokun's orders for DME and genetic testing were not properly payable and reimbursable by Medicare and Medicaid because, among other reasons, Yerokun had no physician-patient relationship with the beneficiaries and did not see or evaluate them. Therefore, Yerokun was not able to accurately certify that the services were medically necessary.

Yerokun's false and fraudulent statements and documents contained in the orders and certifications that he submitted to Company A were in connection with the delivery of or payment for healthcare benefits, items, or services.

Yerokun signed orders for DME and genetic tests for Medicare and Medicaid beneficiaries who resided in the Western Division of the Western District of Missouri, among other places.

Company A paid Yerokun approximately $20 for each order for DME or genetic testing that he signed. Between March 2019 and April 2021, Company A paid Yerokun $44,860 by electronically depositing funds into a bank account ending in 9742 that he maintained at Bank of

America. During this time period, Yerokun ordered DME and genetic tests for 2,184 Medicare beneficiaries.

Between on or around May 2019 to April 2021, the orders for DME that Yerokun signed for Medicare beneficiaries caused Medicare to be billed $6,211,207 by the DME companies and Medicare to pay those companies $3,094,181. Yerokun had no involvement with any entity's billing of DME services to Medicare or Medicaid. He was not aware of the billing amounts or totals.

Between on around February 2019 to July 2019, the orders for genetic testing that Yerokun signed for Medicare beneficiaries caused Medicare to be billed $1,248,344 by the laboratories and Medicare to pay the laboratories $371,302. Yerokun had no involvement with any entity's billing of genetic testing services to Medicare or Medicaid. He was not aware of the billing amounts or totals.

Between or around April 2019 to June 2019, the orders for genetic testing that Yerokun signed for Medicaid beneficiaries caused Medicaid to be billed $2,525,926 by the laboratories and Medicaid to pay the laboratories $524,734.

Individuals unknown to Yerokun, and with no involvement by Yerokun, approached Medicare beneficiary B.C. for her Medicare information. Between on or about May 28, 2019 and June 21, 2019, Yerokun signed orders for B.C. to receive eleven braces, a type of DME. At the time, B.C. was 86 years old. Yerokun did not have a physician-patient relationship with B.C., and he never saw, communicated with, or evaluated her. Yerokun electronically signed orders for the same two knee orthoses for each knee within three weeks. On June 21, 2019, Yerokun signed orders for braces for both of B.C.'s ankles and both of her knees. The time that elapsed between when he electronically accessed B.C.'s pre-populated patient information and electronically signing the orders for those braces was 18 seconds. DME companies billed Medicare $4,994 for those braces, and Medicare paid $2,901 for those braces.

Individuals unknown to Yerokun, and with no involvement by Yerokun, approached Medicare beneficiary A.K. about genetic testing at a food pantry and offered her free hot dogs. A.K. provided a cheek swab and her Medicare information. She never saw nor communicated with Yerokun. On June 1, 2019, after Yerokun reviewed A.K.'s patient information for 38 seconds, he electronically signed the order, which was pre-filled to order 19 genetic tests for her. Based on the tests within the order, the laboratory billed Medicare $16,350 and Medicare paid $5,818 for those tests. Yerokun was not aware of the billing amounts or paid amounts. Individuals unknown to Yerokun, and with no involvement by Yerokun, approached Medicare beneficiary E.M. for her Medicare information. On June 1, 2019, Yerokun spent 34 seconds reviewing Medicare beneficiary E.M.'s patient information and then electronically signed an order that was pre-populated to include 15 genetic tests for her. Based on these ordered tests, the laboratory billed Medicare $14,360 and Medicare paid $2,963 for those tests. Yerokun never saw or communicated with E.M. or the laboratory about these orders.

Individuals unknown to Yerokun, and with no involvement by Yerokun, approached

Medicare beneficiary B.B. for her Medicare information. On that same day, June 1, 2019, Yerokun spent 27 seconds reviewing Medicare beneficiary B.B.'s patient information and electronically signed an order which included 15 genetic tests for her. Based on the tests in that order, the laboratory billed Medicare $14,360 and Medicare paid $3,763 for those tests. Yerokun never saw or communicated with B.B.

Individuals unknown to Yerokun, and with no involvement by Yerokun, approached Medicaid beneficiary C.B. at her senior apartment complex. They told her that the tests would be free because she was covered by Medicaid. She provided the marketers with her Medicaid information, and they swabbed her cheek and gave her a free back scratcher for participating. On May 18, 2019, Yerokun spent 51 seconds reviewing Medicaid beneficiary C.B.'s patient information and then electronically signed a pre-populated order for 25 genetic tests for her. Based on these tests, the laboratory billed Medicaid $30,533 and Medicaid paid $6,560. Yerokun never saw or communicated with B.B. or the laboratory about this order.

As set forth in the table below, between on or about March 2019 and April 2021, Yerokun received $44,860.00 from Company A as payment for signing orders for DME and genetic testing for Medicare beneficiaries.

| Date of Deposit from Barton to Yerokun | Amount of Deposit from Barton to Yerokun |
|---|---|
| March 2019 | $480.00 |
| April 2019 | $100.00 |
| May 2019 | $160.00 |
| June 2019 | $3,920.00 |
| July 2019 | $700.00 |
| August 2019 | $1,820.00 |
| September 2019 | $1,380.00 |
| October 2019 | $3,840.00 |
| November 2019 | $3,360.00 |
| December 2019 | $2,840.00 |
| January 2020 | $1,820.00 |
| February 2020 | $1,440.00 |
| March 2020 | $1,360.00 |
| April 2020 | $1,260.00 |
| May 2020 | $2,880.00 |
| June 2020 | $1,280.00 |
| July 2020 | $2,020.00 |
| August 2020 | $3,160.00 |
| September 2020 | $1,580.00 |
| October 2020 | $5,420.00 |
| November 2020 | $1,380.00 |
| December 2020 | $880.00 |
| January 2021 | $1,060.00 |

| February 2021 | $220.00 |
| March 2021 | $180.00 |
| April 2021 | $320.00 |
| TOTAL | $44,860.00 |

**4. Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands, and agrees that the conduct charged in any dismissed counts of the information as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charge to which he is pleading guilty.

**5. Statutory Penalties.** The defendant understands that upon his plea of guilty to Count One of the information charging him with 18 U.S.C. § 371, the maximum penalty the Court may impose is not more than five years of imprisonment, a $250,000.00 fine, three years of supervised release, an order of restitution, and a $100 mandatory special assessment per felony count of conviction which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class D felony.

**6. Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

7

b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years; that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

d. if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to three years without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

f. any sentence of imprisonment imposed by the Court will not allow for parole;

g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office;

h. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court; and

i. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of restitution.

7. **Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal offenses related to conspiring to make false statements related to health care matters for which it has venue and which arose out of the defendant's conduct described above.

8

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

**8. Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve

9

the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

   a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

   b. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2B1.1(a), which provides for a base offense level of 6;

   c. Pursuant to U.S.S.G. § 2B1.1(b)(2), the base offense level is increased by 6 because the loss is more than $40,000;

   d. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the base offense level is increased by 2 because the offense involved sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means;

e. Pursuant to U.S.S.G. § 3B1.3, the base offense level is increased by 2 because the defendant used a special skill in a manner that significantly facilitated the commission or concealment of the offense;

f. The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a three-level reduction pursuant to U.S.S.G. § 3E1.1(b). The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

g. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

h. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

i. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the information. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

j. The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

**11. Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

**12. Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

**13. Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

    a. oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

    b. comment on the evidence supporting the charge in the information;

    c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

    d. oppose any post-conviction motions for reduction of sentence, or other relief.

**14. Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

      a. the right to plead not guilty and to persist in a plea of not guilty;

      b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

      c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

      d. the right to confront and cross-examine the witnesses who testify against him;

      e. the right to compel or subpoena witnesses to appear on his behalf; and

      f. the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

### 15. Waiver of Appellate and Post-Conviction Rights.

The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by

13

18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

**16. Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

    a. The Court may order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the information which are to be dismissed and all other uncharged related criminal activity. The United States contends that the appropriate amount of restitution to be paid by defendant is $399,021.00 but agrees that defendant may ask the Court to order a lesser amount.

    b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

    c. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

    d. Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

    e. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery restitution.

    f. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy

14

any financial obligations imposed as part of the sentence.

g. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

h. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17. Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or receive, from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

**18. Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising

out of the investigation or prosecution of this matter.

**19. Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

**20. Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

16

21. **No Undisclosed Terms.** The United States and defendant acknowledge and agree

that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties= agreement and will not be enforceable against either party.

22. **Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

Teresa A. Moore
United States Attorney

Dated: 7/22/2022          /s/ Lucinda Woolery
                          Lucinda S. Woolery
                          Assistant United States Attorney

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the information. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 7/22/22            Oluwatobi Alabi Yerokun
                          Defendant

18

rights with respect to the offense charged in the information. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, defendant Oluwatobi Alabi Yerokun's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 9/19/2022

*Ashlee Martin*

Ashlee Martin
Poorav Rohatgi
Attorneys for Defendant

19